UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-20486-CIV-UNGARO/DUBÉ

DOLORES THOMPSON o/b/o
YORDANO PEREZ,

      Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

      THIS CAUSE is before this Court on the Motion for Summary Judgment filed by the Defendant (D.E. #18) and the Motion for Summary Judgment filed by the Plaintiff (D.E. #20) pursuant to a Clerk's Notice of Magistrate Judge Assignment entered by the Clerk of Court, United States District Court for the Southern District of Florida. The issue before this Court is whether the record contains substantial evidence to support the denial of benefits to the minor child Plaintiff, Yordano Perez (hereinafter "Perez" or "Plaintiff").

## I. FACTS

      The Plaintiff's mother, Dolores Thompson (hereinafter "Thompson"), filed an application for child's supplemental security income benefits on the Plaintiff's behalf on September 16, 2002. The application indicated that the child was born on December 26, 1993 and that his disability began on August 26, 2002. (R. 52-55).[1] This application was denied initially and on reconsideration (R. 20-26,

---

1 All references are to the record of the administrative proceeding filed as part of the Defendant's answer.

30-35). Following a hearing on May 18, 2005 (R. 217-226), the ALJ issued a decision denying the request for benefits. (R. 10-19). A request for review filed with the Appeals Council was granted and the Appeals Council remanded the case with instructions for the ALJ to give full consideration to each of the functional domains outlined in the regulations, and noting his findings and rational for all of the domains; further address the opinions of Dr. Hernandez and Dr. Espaillat, and if either opinion if discounted, the ALJ will clearly articulate the reasons for doing so; further develop the evidence regarding the Plaintiff's functioning when he is compliant and when he is noncompliant with his medications; and offer the Plaintiff the opportunity for a hearing, taking any further action needed to complete the administrative record and issue a new decision. (R. 278-281). Following a second hearing on January 9, 2008 (R. 378-452), a different ALJ issued a decision denying the request for benefits. (R. 241-270). A request for review filed with the Appeals Council was denied. (R. 227-230). During the second hearing on January 9, 2008, the Plaintiff did not testify.

Counsel for the Plaintiff noted that Perez had last been examined by a psychiatrist in March 2006. (R. 382). Additionally, licensed psychologist, Dr. Darrell Mills, a medical expert, testified at the hearing. (R. 385-390). Counsel for the Plaintiff objected to Dr. Mills being a psychologist and not a psychiatrist, and requested for the record to remain open for a new psychiatrist which Perez will be seeing. (R. 386-387). The request to keep the record open was denied. (R. 387).

Dr. Mills testified that the record reveals over a number of years, the Plaintiff had issues of impulsivity and distractibility in the classroom from anxiety to ADD to ADHD, however, the emotional issues were not significant. (R. 387). The Plaintiff is in general education with ESE support, his FCAT scores were poor in 2005 and 2006, but has improved significantly. In 2006, Perez did above average in Reading and passed Math with 3's and 4's, meaning he scored grade level

2

or above. (R. 388). Perez went from 1's in 2003 to 3's and 4's in 2004. The Plaintiff's class grades in 2007 were B's/A's in Comprehension, A's in Music and Art, C's in Language Art and Science, D's in Math and B's/C's in World Geography. (R. 388-389).

Thompson testified that Perez's grades in 3rd grade were A1-A in Language, C2-B in Science, and D3-B in Social Studies. The Plaintiff's conduct never fell below a "B." Thompson stated that 2 psychological tests performed, one when the Plaintiff was in 2nd grade, gave "fairly good" results. (R. 391). Additionally, Thompson stated that Perez's IQ, verbal and math scores have always been in the average to above average range, including a psychological test performed in September 2007. (R. 392-393). According to Thompson, the Plaintiff's math scores, which are short-term concentration, have been "consistently okay" regardless if he's been on medication or not. (R. 393).

Thompson further testified that in 2006, Perez's only ESE class was Reading, his other classes were all "mainstream classes with less restrictions." (R. 394). In 2007, Perez's main classes were with ESE help and his elective courses were without ESE help. (R. 394). At this point, it is unclear from the transcript if it was Thompson's testimony or Dr. Mills' who testified that the Plaintiff's emotional issues have never been as significant as the ADHD diagnosis. (R. 394-395).

The ALJ returned to questioning Dr. Mills, who opined that Drs. Artilles' and Panella's evaluation that the Plaintiff's functional equivalence were all extreme and one marked without medications were an "over exaggeration of those fields." (R. 395-397, 400). Dr. Mills believed that the evaluation was "based on reported behavior rather than on the behavior that they have seen." (R. 397). The ME testified that a child with the limitations imposed by Drs. Artilles and Panella would be making D's and F's as "[m]ost kids with ADD that are not medicated don't do quite this well."

3

(R. 400).

According to Dr. Mills, the Plaintiff's domains are as follows: acquiring and using information, attending and completing tasks, interacting and relating with others, physical well being, motor physical, and caring for himself are less than marked. (R. 398-400). The ME added that there are periods when the Plaintiff does even better. (R. 400). Dr. Mills also noted the Plaintiff had been diagnosed with ADD many times. Specifically, Dr. Mills testified that pertaining to Section 112.00 Mental Disorders - Childhood, the Plaintiff does not mentally or functionally equal a listing. (R. 401-403). Additionally, the ME testified that if Perez would have complied with his prescribed medications and medical treatment, he would have improved. (R. 404).

Dr. Mills noted that there have been times where the Plaintiff's mother and teachers have admitted that Perez has stopped taking his medication. (R. 404-405). Also, Dr. Mills noted the record does not reveal any side effects of the medication, and although Perez's sister and mother assert that he has hallucinations or anxiety, the record does not show any prescribed medication to deal with these problems. (R. 405).

Next, the ALJ and Dr. Mills went over the prescribed medications which appear in the medical record and found as follows: On November 27, 2002 and July 16, 2003, Risperdal (given for depression, some psychotic features, hyperactive), 1/2 milligram, 30 pills were filled; on November 2, 2003, March 24, 2004, July 12, 2004, February 28, 2005 and April 12, 2005 Adderall (given for ADHD) was filled; on March 24, 2004, Abilify was filled. (R. 406-407). The record shows that Abilify and Adderall were switched "back and forth." (R. 408). Dr. Mills testified that it is reported in the medical records that there is psychosis. (R. 409).

On June 6, 2002, the Plaintiff was put on a trial of Remeron and Metadate due to a history

4

of bipolar in the family. (R. 411). Dr. Mills noted that handwritten doctor's notes dated August 1, 2002, which stated as follows: "not compliant with meds, still aggressive, not following directions... await results of med change so no improvement with Metadate, but... not compliant." (R. 410). Dr. Mills also noted that medical notes dated November 21, 2002, revealed that the Plaintiff's mother reported that Perez's condition had deteriorated, he was still doing okay at school, but was more aggressive at home. Dr. Mills testified that the same medical notes stated "[p]ossible psychotic symptoms, doubt related to Adderall... Add rule out kinchasis (Phonetic)?... diagnosis, trial Risperdal." (R. 412).

The ME goes on to note that on January 2003, medical notes stated that the Plaintiff was "[n]ot disruptive in school... still disoriented and still aggressive... increase in anxiety, HR, which now failing four subject[s]... increase both meds... Adderall and the Risperdal." (R. 412-414). Dr. Mills testified that if Risperdal was given for aggression, Perez would not have an "increase of aggression at home and a decrease at school... unless the household was extreme chaotic or stressful for him." (R. 413). According to Dr. Mills, Risperdal would work the same at both school and home, unlike Adderall which wears off, Risperdal builds up in your system and takes 2-6 weeks in order to see any change in behavior. (R. 413).

Dr. Mills stated that there are only 2 prescription refills for Risperdal, i.e. in November 2002 and July 2003. (R. 414). Dr. Mills further stated the difficulty with the medical records is that the Plaintiff's problematic behavior reported by family members "does not match medication prescribed or taken or school behavior." (R. 414). The ALJ noted that in January 2003, when the medical record reveals an increase for Adderall and Risperdal, according to Walgreens, those prescriptions were never filled. (R. 414).

5

Furthermore, Dr. Mills testified as follows:

> A       ... There's too many blanks [], but the blanks are not at school.
> There's more consistency at school.  That's just the more consistent
> behavior than you see at school.
>
> ...
>
> A       ... I cannot find though the behaviors in schools to map what
> the mother's saying to what's the reported behaviors in these reports,
> so I have to look at how his global functioning is, report cards and to
> try to figure out his functioning.  If you are being silly and hyper every
> single day, you are not getting your lessons done and you would not
> be making B's.  You would be making D's, but you would not be
> making B's and C's.  In the least restrictive classrooms, which are art
> and music, you would not, definitely not be making A's in and I think
> he did.

(R. 415, 417-418).

Dr. Mills testified that psychiatric notes dated February 28, 2003, revealed there was a decrease in school problems, then in May 2003, psychiatric notes revealed "[p]atient has not been on meds." (R. 419-420).  According to Dr. Mills, the Plaintiff's inconsistencies are adding to his deterioration. (R. 420).  In August 2003, the Plaintiff was seen with his mother who reported more aggression, very agitated on Adderall, very disruptive despite medications.  Dr. Mills noted that in August 2003, the case manager was the one who signed the medical record, not the psychiatrist. (R. 420-421).  In September 2003, Perez was reported to be "less disruptive, less hyperactive, calm," however, he was put on Zyprexa for the first time.  Prescription for Zyprexa were filled on September 30, 2003 and November 2, 2003. (R. 422).

On October 27, 2003, Perez was reported as "less aggressive, much control, less agitated." (R. 424).  On December 1, 2003, medical records reveal that the Plaintiff's grades are much better, he was still disruptive at home, and non-compliant with medications.  On January 2, 2004, Perez's

6

mother reported that the Plaintiff was sleeping better with Zyprexa, was still aggressive with her, and he was compliant with medications. (R. 425).  On March 2004, medical records show that Zyprexa was discontinued, and Abilify was continued. (R. 425-426).

Dr. Mills testified that hallucinations, delusions or psychosis was never checked-off, and all areas seem to be "within normal limits except affect," which is always "inappropriate." (R. 426).  In May 2004, while on Abilify, the Plaintiff seemed to have improved including his FCAT scores. (R. 426-427).  Perez was promoted to the 4th grade in July 2004 and showed improvement and less aggression with medication compliance. (R. 427).  However, in October 2004, Perez is reported to be less compliant with medications, annoys everyone at home, instigates, cannot sleep 4-5 hours. (R. 427).

The following colloquy took place between the ALJ and the ME:

> Q     Okay.  Well, let me ask you this, Doctor.  Having gone through this, has your opinion changed in any way from your prior testimony?
>
> A     In terms of the listings?
>
> Q     In terms of listings or functional, the domains.
>
> A     I think the issues have to do with the compliant.  I think the main issues have to do with compliance with, main issue is with client's medication and the issues at home with the authority with his mom, with authority figures, who is ever in charge, because that's where the most aggression and hostility is directed, even from reports.
>
> Q     So your testimony is the same?
>
> A     Yeah.

(R. 427-428).

Next, Dr. Mills reviewed a psychiatric evaluation form and opined that the area to "maintain

7

attention and concentration" which was noted as "none" is not supported overall by the Plaintiff's

grades. (R. 429). When asked by the ALJ if there were any medications prescribed for anxiety, Dr.

Mills noted that in January 2003, the Plaintiff was prescribed Risperdal and stated as follows:

> A    I, not under my understanding, but I'm going to say that I
> can't answer that in my position as well as I'd like. It's not my
> understanding. It's more for the major affective disorders. But a lot
> of the SSRI's, you know, like Prozac, Paxil, which are for
> antidepressants, also deal with anxiety. And I think they would prefer
> to give that over something in the anxiety category.
>
> Q    Is there anything in the treatment notes that show he had
> anxiety or prolonged anxiety?
>
> ...
>
> A    Under a listing.
>
> Q    Okay. 112.06.
>
> A    The required level of severity for these are met when the
> requirements in both A and B are satisfied; A, excessive anxiety
> manifests when a child is separated or separation is threatened from
> parent. I don't see evidence of that. Excessive or persistent
> avoidance of strangers. I don't see evidence of that. Three, persistent
> and excessive anxiety or worry, apprehensive, expectation,
> accompanied by motor attention, hyperactivity or visions with
> standing. I assume that's what she's looking at, but we don't have,
> you've got the behaviors but I don't have nay documentation that he's
> got unrealistic or excessive worry about it. Four, persistent, irrational
> fear of a specific object, activity or situation, results in a compelling
> desire to avoid the dreaded object. I don't see evidence of that. Five,
> recurrent, severe panic attacks. I don't see evidence of that. Six,
> recurrent obsessions or compulsions, which cause moderate distress.
> I don't see. Seven, recurrent, intrusive recollections of traumatic
> experience. I don't see evidence of that.

(R. 429-431).

The ME confirmed that around this time, the psychiatrist increased Risperdal, however,

according to the medication list the Plaintiff did not fill the medications. (R. 431). Dr. Mills testified

that Perez was cognitively "marked" in 2000 when he was withheld in school for one year. (R. 431-432). Counsel for the Plaintiff noted that Perez was withheld because of his reading FCAT score. (R. 433). The ALJ noted that in 2002 the Plaintiff was in 3rd grade and his Reading/Language grades were A1-A. (R. 433). Therefore, the ME opined that in 2002, the Plaintiff was "not marked in any category." (R. 434). Dr. Mills disagrees with a functional assessment form completed on June 12, 2003, wherein cognitive development is checked-off as "marked." (R. 431, 435, 439).

Dr. Mills noted that on October 28, 2002, the Plaintiff made an F in Language Arts and Reading. (R. 436). However, the Plaintiff's grades improved when he was in ESE classes, which provide him with extra help. Additionally, Dr. Mills noted that without ESE classes the Plaintiff was "average in 30 which is still not marked." (R. 439). The ME testified that forms filled out by psychiatrists in clinics are based on what the parent said at the time. (R. 441). According to Dr. Mills, if Adderall is appropriate, the Plaintiff would show a "calming" improvement in distractibility and oppositional defiant behavior. (R. 443).

The following colloquy took place between counsel for the Plaintiff and the ME:

> Q    So it's a matter of dosage?
>
> A    Yes. It would be a matter of dosage and appropriate - - the reason I hesitate is that there have been times, in going through this day to day thing that we were doing talking about things, that apparently that he has improved, or reportedly he's improved at some point in time in the record. Again, this is all based, the one time, the one thing that the teacher said he was improved there was only report it said, and I think it coincided with, I think it coincided with a time that he was reportedly cooperative with the medication.
>
> Q    Okay.
>
> A    He will have a rebound effect from the Adderall at nighttime. Is that what you are trying to ask me? The problem, Adderall wears off and he will have a rebound of behavior. You'll see the behaviors

in the evening if he's on Adderall.

Q      What, okay. You're saying it wears off?

A      Yes. It can wear off in the course of a day or not.

Q      Okay. All right. So even if he had the proper medication, do you, in your opinion could it be possible to have marked behavior changes later on in the day that could possibly come to a global functioning problem?

A      No. Not in my opinion, no, because it's not global.

(R. 443-444).

Counsel for the Plaintiff asked Dr. Mills if he was familiar with Metadate, Zyprexa and Abilify, to which Dr. Mills responded, "not enough to answer questions." (R. 444-445). The ME testified that the psychological testing performed by Dr. Artiles showed that the Plaintiff had difficulty in one area (Language), but it was not global. (R. 445-447). Next, counsel for the Plaintiff asked Dr. Mills if he thought that Perez's difficulty with Language could affect his social functioning skills. (R. 447). Dr. Mills responded by stating it was possible, however, there was no "documentation to support the deficiencies that are creating these problems for him." (R. 447). According to Dr. Mills, the fact that the Plaintiff was unable to read big words is not a marked cognitive impairment. (R. 450-451).

The ME testified the Plaintiff had never been diagnosed with bipolar disorder, instead the doctors wrote "rule out." (R. 448). Dr. Mills also testified the Plaintiff sat at the hearing for 2 hours and acted at an age appropriate level. (R. 450).

In addition to the testimony presented at the hearing, medical records were submitted to the ALJ. However, a review of the medical records and the specific issues raised by the Plaintiff in his Motion for Summary Judgment shows the resolution of the issues do not require this Court to specifically set out all the medical evidence in detail. Accordingly, this Court will discuss the legal

10

issues involved and will incorporate the facts as appropriate within the arguments presented below.

On February 28, 2008, the ALJ issued a decision finding that the Plaintiff suffered from the severe impairments of attention deficit hyperactive disorder (ADHD), history of oppositional defiant disorder (ODD) and asthma, but the impairments did not meet or equal a listed impairment. (R. 247-248). Specifically, the ALJ noted the Plaintiff "has not had asthma exacerbation episodes that have required repeated hospitalizations or medical care set forth in the regulations." The ALJ also noted that regarding the ADHD impairment, the Plaintiff "has failed to prove that the symptoms are disabling to the extent alleged due to his failure to comply with the prescribed treatment." (R. 248). The ALJ found that the Plaintiff had less than marked impairment in all six domains. (R. 264-270). Additionally, the ALJ found that the statements in the medical record of the Plaintiff's mother and sister, including a sworn affidavit signed by the Plaintiff's mother, are not credible as they are not supported by contemporaneous treatment notes and by pharmacy printouts. (R. 249, 259, 261).

## II. **LEGAL ANALYSIS**

Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. section 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Kelley v. Apfel, 185 F.3d 1211, 1213 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

In determining whether substantial evidence exists, the court must scrutinize the record in its entirety, taking into account evidence favorable as well as unfavorable to the Commissioner's

decision. Foote v. Chater, 67 F.3d 1553 (11th Cir. 1995);  Lamb v. Bowen, 847 F.2d 698, 701 (11th Cir. 1988).  The reviewing court must also be satisfied that the decision of the Commissioner correctly applied the appropriate legal standards. See,  Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987).  The court may not reweigh evidence or substitute its judgment for that of the ALJ, and even if the evidence preponderates against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence. See, Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005).

The restrictive standard of review set out above applies only to findings of fact.  No presumption of validity attaches to the conclusions of law found by the Commissioner, including the determination of the proper standard to be applied in reviewing claims. Brown v. Sullivan, 921 F.2d 1233, 1236 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  The failure by the Commissioner to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal. Cornelius v. Sullivan, 936 F.2d 1143, 1145-1146 (11th Cir. 1991); See also, Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982).

A person under the age of 18 shall be considered disabled "if that  individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §1382c (a)(3)(C)(i).

A three-part test is utilized in determining a child's disability.  The first step is to determine whether the child is performing substantial gainful activity. 20 C.F.R. §416.924(b).  If not, the next inquiry is whether the child suffers from a severe impairment or combination of impairments. 20

C.F.R. §416.924(c).  If so, the final step is to determine whether the child's impairments meet, medically equal, or functionally equal a listed impairment.  20 C.F.R. §416.924(d).

In order to "functionally equal" the listings, an impairment "must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. §416.926a(d). The six "domains" which are considered in making the determination are as follows: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself and (6) health and physical well-being. 20 C.F.R. §416.926a (b)(1)(i)-(vi). See also Shinn v. Commissioner of Social Security, 391 F.3d 1276 (11th Cir. 2004).

A "marked limitation" is defined in the regulations as present if the impairments seriously interfere with the "ability to independently initiate, sustain, or complete activities." This limitation is the equivalent of the functioning that  would be expected "on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." §416.926a(e)(2)(i). Additionally, if the child is younger than 3 years old, a marked limitation will be found if the child is "functioning at a level that is more than one-half but not more than two-thirds of your chronological age when there are no standard scores from standardized tests in your case record." §416.926a(e)(2)(ii).  A marked limitation will also be found if a child has a valid score on a comprehensive standardized test designed to measure ability or functioning in a particular domain, that is two standard deviations or more below the mean, but less than three standard deviations and day to day functioning of the child in the domain-related activities is consistent with the score. §416.926a(e)(2)(iii).

The regulations also make special provision for finding that a marked limitation exists in the

13

sixth domain of functioning, "Health and physical well-being" as follows:

> ..if you are frequently ill because of your impairment(s) or have frequent exacerbations of your impairment(s) that result in significant, documented symptoms or signs. For purposes of this domain, "frequent" means that you have episodes of illness or exacerbations that occur on an average of 3 times a year, or once every 4 months, each lasting 2 weeks or more. We may also find that you have a "marked" limitation if you have episodes that occur more often than 3 times in a year or once every 4 months but do not last for 2 weeks, or occur less often than an average of 3 times a year or once every 4 months but last longer than 2 weeks, if the overall effect (based on the length of the episode(s) or its frequency) is equivalent in severity.

§416.926a(e)(2)(iv).

An "extreme" limitation is present when the impairment(s) "interferes very seriously with your ability to independently initiate, sustain, or complete activities." §416.926a(e)(3)(i). The regulations add that an extreme limitation does not necessarily mean a total lack or loss of ability to function, but it is the "equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." Id. For children under age 3, an extreme limitation will generally be found if the child is functioning at a level of one-half of the chronological age or less if there are no scores from standardized tests in the record. §416.926a(e)(3)(ii). An extreme limitation will also be seen if a child has a valid score that is three standard deviations or more below the mean on a comprehensive standardized test which was designed to measure ability or functioning in a domain, and the day-to-day functioning in such activities is consistent with the score. §416.926a(e)(3)(iii).

As with "marked" limitations, there is also criteria in determining the presence of an "extreme limitation" in the "Health and physical well-being" category. Under this provision, an extreme limitation will be seen if the child is frequently ill because of the impairments or has frequent

14

exacerbations of the impairment(s) that result in "significant, documented symptoms or signs substantially in excess of the requirements for showing a 'marked' limitation." The regulation also notes that if the child had episodes of illness or exacerbations of the impairment(s) which would be rated as "extreme," the "impairment(s) should meet or medically equal the requirements of a listing in most cases." §416.926a(e)(3)(iv).

In the present case, the ALJ found less than marked limitations in all six domains. Thus, according to the ALJ, the Plaintiff was not disabled. The Plaintiff contends that this determination was error since the ALJ failed to properly develop the record pertaining to Perez's ability to function when compliant and not compliant with prescribed medications; the ALJ improperly rejected the assessments of two treating physicians and two consultative examiners; the ALJ's findings regarding Perez's functional abilities are not properly supported; the ALJ failed to consider Perez's newly diagnosed bipolar disorder, reading disorder and written language expression disorder; the ALJ failed to provide a proper opportunity for Perez's mother and Perez to testify.

The Plaintiff's first four issues are somewhat interrelated, since the ALJ's findings concerning the Plaintiff's credibility and non-compliance also constitute the basis for the weight given to the two treating physicians and two consultative examiners, the ultimate functional abilities determination, and the ALJ not considering Dr. Artiles' consultative examination which revealed a diagnoses of bipolar, Reading and written Language expression disorders.

At the beginning of the decision, the ALJ stated as follows:

> The undersigned requested updated medical and school records as well as any missing evidence from the claimant's attorney (B15B). However, the records submitted by counsel consisted of minimal school records without any updated test results, or disciplinary (suspension) information and no updated records. In view of the

15

> scarce evidence, the undersigned ordered 2 consultative examinations
> – a psychological evaluation with testing as well as a psychiatric exam
> and evaluation. Both consultative examiners were asked to comment
> on the claimant's functionality when on medication, as well as when
> off medication. The undersigned also requested the testimony of a
> State licensed child psychologist to appear at the hearing in the
> capacity of a medical expert, to explain the inconsistencies in the
> record (B16B).

(R. 244).

Regarding the issue of compliance and non-compliance, the ALJ found that "non-compliance issues belie the severity of this assessment." (R. 250). The ALJ also found that pharmacy printouts failed to reflect evidence of any type of consistency that prescriptions were filled. For example, the ALJ points out that in 2002 prescriptions for Clonodine or Seroquel were never filled; Remeron was not filled in July through December 2002; a 30 pill prescription of Risperdal was filled in November 2002, but not filled again until June 2003; and the Plaintiff should have ran out of Adderall medication in mid-December 2002, yet it was not refilled until mid-2003. (R. 251-253). The ALJ also points to pharmacy print-outs for 2004, which show at least 7-8 months in 2004 the Plaintiff was non-compliant with Ability, Adderall and Zyprexa. (R. 256). Similar inconsistencies were noted by the ALJ for the year 2005 with Adderall, Abilify, Vistaril, Seroquel and Clonopine. (R. 256-257).

Additionally, the ALJ points to medical records which show consistent non-compliance with prescribed medication and "misrepresented facts" on the part of the Plaintiff's mother and sister. (R. 249-260). Specifically, the ALJ points to the Plaintiff's first hearing wherein his mother admitted to not filling Perez's psychotropic medication prescriptions in several years; and the mother's affidavit which explained that a gap in the Plaintiff's psychiatric appointments was due to her caring for her daughter who had been in an automobile accident. However, the ALJ points to the absence of

16

psychiatric care for almost 2 years, including 7 months prior to her daughter's accident. (R. 249, 259). The ALJ found that the Plaintiff's mother's affidavit dated October 27, 2007, not credible as it was not supported by contemporaneous treatment notes, nor by the pharmacy printout. (R, 259). In conclusion, the ALJ found that the record "shows significant gaps in filling prescriptions during 2002, 2003 and 2004, 2005; and no medication refills at all in 2006 and 2007." (R. 260).

In discussing the determinations made by the two consultative examiners and two treating physicians, the ALJ noted as follows:

> Although on first blush, it might appear from the two consultative examiners (CEs) that there were a functional equivalence, the licensed psychologist (Mills) who appeared (who is an expert as to children and school testing and placement), credibly explained why those opinions were not supported and contrary to the actual evidence of record.... Moreover, the record reflects that much of the record and findings of these two CEs (09/07) and other examining sources were based on representations of the claimant's mother – representations which apparently have been false and deliberately and willfully misleading. This was specifically also noted by Darrell Mills, PhD. ...
>
> ...
>
> ... The record reflects that much of the record and findings of the September 2007 consultative examinations and of other examining and treating sources was mostly based on Thompson's (or family members) misrepresentations regarding the claimant's compliance. Dr. Mills' expert opinion at the hearing noted the same, based on his thorough review of the longitudinal records, including the medication and pharmacy records.

(R. 248-249).

The ALJ evaluated the consultative examination performed on November 27, 2002 by Alejandro Arias, Psy,D. and a psychiatric examination performed in September 2007 by Laura Artiles, Ph.D. (R. 252, 259). Specifically, the ALJ accorded little weight to the statement and functional

assessment of Dr. Artiles due to the overall evidence of record, the Plaintiff's non-compliance with medications, the Plaintiff's sister's self-reporting, and Dr. Mills' testimony. (R. 260).

Additionally, the ALJ evaluated the medical records from the Plaintiff's treating psychiatrist, C. Lynn Hernandez, M.D. and ultimately assigned them little weight based primarily on the Plaintiff's non-compliance with medication, the Plaintiff's mother's self-reports, and inconsistency with Dr. Hernandez's treatment notes. (R. 252-255). Specifically, the ALJ noted as follows:

> The undersigned further rejects Dr. Hernandez's findings as inconsistent with the contemporaneous treatment notes, including evidence submitted after this assessment. In fact, Dr. Hernandez's January 2003 report is so difference from her treatment notes that the only reasonable explanation is that she relied heavily on Thompson's symptom reports of the claimant's academic and behavioral problems to reach this conclusion. Miami Behavioral's Medication Record Report (hereinafter medication record) called for increased Risperdal and Adderall doses with prescriptions issued in April 2003. However, Thompson purchased those medications in May 2003 instead (T/159 versus B20B). In light of the claimant's non-compliance, the diagnosis of a severe anxiety disorder was also inconsistent with the general clinical picture presented by the claimant in view of the other impairments and Thompson's misrepresentations. Moreover, the February 2003 Treatment Plan Review Form noted decreased disruptive behavior at school per the teacher, versus Thompson's reports of disruptive and anxious behavior at home (T/205). In addition, the record noted the claimant had favorably responded to medication changes. The undersigned accords little weight to Dr. Hernandez's findings as inconsistent with the treatment records, including her own treatment notes. Although Miami Behavioral records show GAF scores in the low 40s range during that time, the undersigned observes that these scores were also at odd with the relatively moderate mental status examination findings. Likely these GAF scores reflected Thompson's reports and Dr. Hernandez's belief that these symptoms persisted despite medication compliance. Even if the undersigned were to accord considerable weight to Dr. Hernandez's assessment, which the undersigned does not, the improvement reflected in the February 2003 Treatment Plan Review and the mild to moderate findings reflected in the rest of the 2003 records belie this strict assessment (T/196-207).

(R. 253-254).

Next, the ALJ evaluated the opinion of Ricardo K. Espaillat, M.D., treating psychiatrist, specifically an individualized functional assessment and case summary completed by Dr. Espaillat and accorded it little weight. (R. 256). The ALJ explained that, according to the medical records, Dr. Espaillat physically examined the Plaintiff on June 2005, which was one month after Dr. Espaillat completed the individualized functional assessment. (R. 256-257). The ALJ further explained as follows:

> Dr. Espallat[]... completed the statement probably using the information on file, not based on his own examination findings. This is the most reasonable explanation since he only saw the claimant one time, in June 200[5] per Miami Behavioral's treatment notes, which was a full month after the May 200[5] assessment (see T/211-213 versus B9B/1).

(R. 256).

On November 27, 2002, Perez underwent a Psychological Evaluation with Alejandro J. Arias, Psy.D. which recounted the Plaintiff's history as told by his mother. (R. 141-144). Specific observations by Dr. Arias were that Perez's appearance and dress were consistent with his age, and his gait, posture and hygiene were normal. (R. 141). Dr. Arias noted that the Plaintiff's general attitude and behavior throughout the evaluation were cooperative and motivated, and he displayed a good degree of eye contact. Additionally, Perez's speech and language skills were substantive and grammatical with no expressive or receptive difficulties. The Plaintiff denied any anxiety, depression, and suicidal/homicidal ideations, plan or intent. (R. 142).

According to the Plaintiff's mother, he suffered from visual and audio hallucinations. (R. 142). Dr. Arias noted that Perez was oriented as to person and place; his insight and persistence were fair;

pace was slow; and concentration was normal. (R. 142-143). Dr. Arias diagnosed the Plaintiff with ADHD, predominantly inattentive type (by history); ODD (by history); Rule Out Bipolar Disorder with Psychotic Features. (R. 143).

On January 28, 2003, Dr. Hernandez completed a Psychiatric Evaluation which diagnosed the Plaintiff with ADHD, ODD, Anxiety Disorder NOS, Asthma, heart murmur, academic, environmental, social disorder and assigned a GAF of 43. (R. 151-157). Dr. Hernandez had been treating the Plaintiff since June 6, 2002 and Perez's medications were noted as Adderall and Risperdal. (R. 151). Although the form completed by Dr. Hernandez was for an adult, the applicable child categories showed "marked" difficulties in planning daily activities; initiating and participating in activities independent of supervision or direction; and maintaining social functioning (R. 153-154). The Plaintiff was noted as having a "poor" abilities in making occupational adjustments and personal-social adjustments. (R. 156-157).

On May 5, 2005, Dr. Ricardo K. Espaillat completed an Individualized Functional Assessment and Case Summary which found "marked" limitations in cognitive development/function and concentration, persistence, and pace; "moderate to marked" limitations in motor development/function; "moderate" limitations in social development/function and personal/behavioral development/function; and "no evidence of limitation" in communicative development/function. (R. 211-213). Dr. Espaillat noted the Plaintiff's prognosis as guarded. (R. 213).

On September 7, 2007, Perez underwent a second Psychological Evaluation, which was performed by Laura M. Artiles, Ph.D, P.A. (R. 327-332). The Plaintiff arrived at the examination with his sister. Dr. Artiles noted that during the examination the Plaintiff stayed attentive and cooperative; was able to communicate well verbally, however was observed fidgety and easily

distracted; his facial expression and mood were adequate; was not aggressive; and was alert, coherent and well oriented. (R. 328). According to his sister, he was "being treated with medication to improve his attention and reduce his hyperactivity, but he continued exhibiting significant emotional instability." (R. 328).

Dr. Artiles noted that Perez's results from the WISC-IV indicated that the Plaintiff was functioning within the average range of intelligence, and significant weaknesses were found in his working memory. The Plaintiff's highest scores were found in his verbal concept formation skills, comprehension of common sense social situations and perceptual motor integration abilities; and his weaknesses were found in his auditory processing, auditory short-term memory and his processing speed. (R. 328). The results from the Woodcock Johnson academic testing indicated significant academic deficiencies in language arts, but average skills in math. (R. 329). Additionally, Woodcock Johnson (cognitive subsection) suggested deficiencies in his visual and auditory attention processing and short-term memory. (R. 330).

Dr. Artiles diagnosed the Plaintiff with ADHD, combined type; Bipolar Disorder, NOS; Reading Disorder; and Disorder of Written Language Expression. (R. 331). Dr. Artiles further completed a Childhood Functional Assessment which found that Perez had "extreme" ability in interacting and relating with others; and "marked" ability in acquiring and using information; attending and completing tasks; self-care; and health and physical well-being. The category for moving about and manipulating objects was not checked. (R. 332).

On September 24, 2007, the Plaintiff underwent a consultative examination with Alfredo Piniella, M.D. (R. 333-336). His past psychiatric history was noted as follows:

> According to the sister he has suffered from ADHD since age 7 and

21

> has been under treatment ever since. The sister cannot recall the
> doctor's name. However she reports that he is currently taking Abilify
> and Adderal.

(R. 334).

Dr. Piniella diagnosed him as follows: Axis I: ADHD; Axis II: Deferred; Axis III: Asthma and

Heart Murmur; Axis IV: Problems with Social Environment; Axis V: 20. Dr. Piniella's impression

was poor prognosis and recommended that the Plaintiff continue outpatient psychiatric treatment. (R.

335). Dr. Piniella further completed a Childhood Functional Assessment which found that Perez had

"marked" ability in self-care; and "extreme" ability in all other categories. (R. 336).

The applicable regulations provide that in order to get benefits, a prescribed treatment must

be followed if the treatment can restore the ability to work. If a claimant does not follow the

prescribed treatment without a good reason, the person will be found not disabled. 20 C.F.R.

§§416.930, 404.1530.

In the present case, the ALJ discussed the Plaintiff's failure to comply with taking his

medications and follow-up treatments. Throughout her decision, the ALJ discussed the Plaintiff's

ability to function when compliant and not compliant with prescribed medication. Additionally, as

set out above, the ALJ gave sufficient and multiple reasons for finding that non-compliance with

medication and medical instructions, was the main issue affecting this case. As quoted above,

although at first glance, it appears from the consultative examiners that the Plaintiff has functional

equivalence, further review of the file dictates otherwise. Accordingly, this Court finds that the ALJ

properly evaluated the Plaintiff's failure to comply with prescribed medications and properly relied

on the record as a whole. This determination is supported by substantial evidence, and thus, there

is no basis for error.

The opinion of a treating physician is entitled to substantial weight unless good cause exists for not heeding the treating physician's diagnosis. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause has been seen when the treating doctor's opinion was not bolstered by the evidence; the evidence supported a contrary finding or the opinion was conclusory or inconsistent with the physician's own medical records. If the ALJ disregards the opinion of a treating physician, the ALJ must clearly articulate his reasons. See Phillips v. Barnhart, 357 F.3d 1232, 1240-1241 (11th Cir. 2004).

As set out above, this Court finds that the ALJ reviewed the opinions of Drs. Hernandez and Espaillat, and the consultative examiners, discussed the findings of each, and explained the weight assigned to each. As such, it is this Court's opinion that the ALJ complied with the requirements as set out by the regulations, and that the ALJ's decision was supported by substantial evidence. Based on this finding, the Plaintiff's argument regarding Perez's functional abilities are deemed moot as the ALJ properly rejected the opinions of the treating and examining physicians.

Additionally, the Plaintiff's argument that the ALJ failed to consider Perez's newly diagnosed bipolar disorder, reading disorder, and disorder of written language expression as part of her findings lacks merit. The Plaintiff's newly diagnosed disorders were based on the Dr. Artiles' assumption that Perez was "being treated with medication to improve his attention and reduce his hyperactivity," when in fact as noted from the record, he was not compliant with taking his medications. Therefore, test performance and results submitted by Dr. Artiles were properly rejected, and Dr. Artiles' statements and functional assessment given little weight.

The Plaintiff's final point of contention is that the ALJ failed to provide a proper opportunity for hearing as ordered by the Appeals Council. Specifically, the Plaintiff contends that the Plaintiff

23

nor his mother was allowed to testify regarding any of the issues being discussed by Dr. Mills or any of the issues under consideration by the ALJ.

As noted above, this cause has been before this Court previously. The decision issued by the first ALJ on September 26, 2005, found that the Plaintiff had "marked" limitation regarding acquiring and using information; "less than marked" limitation regarding attending and completing tasks; and "no" limitation regarding health and physical well being, interacting and relating to other, moving about and manipulating objects, and caring for his personal needs. (R. 19). This Court reversed and remanded this cause to the Commissioner of Social Security for further administrative proceedings. Specifically, for the ALJ to give full consideration to each of the functional domains outlined in the regulations and noting her findings and rational for all of the domains listed; to further address the opinions of Drs. Hernandez and Espaillat and, if applicable, to clearly articulate the reasons for discounting either opinion; to further develop the evidence regarding the Plaintiff's functioning when he is compliant and non-compliant with his medications; and "[i]n furtherance of the above, the Administrative Law Judge will offer the claimant the opportunity for a hearing, take any further action needed to complete the administrative record and issue a new decision." (R. 281).

This Court finds that the ALJ gave full consideration to each of the functional domains and found "less than marked" limitation in all six functional domains. The ALJ articulated her reasons by noting the inconsistencies between school records, pharmaceutical records, the treating doctors own treatment notes and Thompson's Affidavit. (R. 263-270). Additionally, as set out above, this Court finds that the ALJ thoroughly recounted the opinions of Drs. Hernandez and Espaillat, and articulated her reasons for discounting same; and fully complied with the Court's previous remand order. Accordingly, there is no basis for relief.

24

### III. CONCLUSION

Based on the foregoing, this Court finds that the decision of the ALJ was supported by substantial evidence and that the correct legal standards were applied.   Therefore, it is the recommendation of this Court that the decision of the Commissioner be AFFIRMED.   Accordingly, the Motion for Summary Judgment filed by the Defendant (D.E. #18)  should be **GRANTED**  and the Motion for Summary Judgment  filed by the Plaintiff (D.E. #20) should be **DENIED**.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days from service of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Ursula Ungaro, United States District Judge.  Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. Loconte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988); R.T.C. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE AND ORDERED** this __11__ day of February, 2010.

ROBERT L. DUBÉ
UNITED STATES MAGISTRATE JUDGE